Morris and Wife vs. Stokes, adm'r.

No. 105.—Thomas Morris, & Wife, plaintiffs in error, vs. William B. Stokes, adm'r, cum testamento, defendant in error.

[1.] The sayings of a principal legatee under a will, though not a party to the record—admissible in evidence, so as to affect his own interest only.

[2.] Any acts or declarations in connection with these acts, by the principal legatee, who procures the will under which he claims to be written, may be given in evidence as a part of the *res gestae.*

A will may be established in part, and rejected in part; good as to some parties, and bad as to others.

[3.] It is not competent to testify to the mere verbal statements of a party, unless the witness is certain as to the person from whom he heard them.

[4.] It is allowable to repeat an entire conversation, which occurred between the witness and a party, which consisted, amongst other things, of distinct charges made by the witness, and which were silently acquiesced in, or answered and justified.

[5.] In charging the jury as to the standard or measure of testamentary capacity it is not error in the Court to instruct them: "That, be the testator wise or unwise, yet he is capable of willing his property, unless totally deprived of reason." Nor is it wrong, in explaining the extent of the influence necessary to destroy a will, to tell the jury that it must amount to "fear and force."

[6.] It is error in the Court, without qualification or explanation, to charge the the jury that "if by acts of kindness, a guardian procures his ward to make a will in his favor, that will not vitiate it. That if he provided his ward with horses, money, jewelry and fine clothes, with a view to procure the testator to make a will in his favor, that will not amount to such undue influence, as to vacate the will."

Caveat to will, from Muscogee Superior Court. Tried before Judge Worrill, at November Term, 1856.

The questions in this case arose upon the admission to probate in solemn form of law, of a paper purporting to be the last will and testament of Pearce A. Philips, deceased, who departed this life a minor about eighteen or nineteen years of age.

The following is a copy of the will, viz:

State of Georgia. In the name of God, amen!

I, Pearce A. Philips, being weak of body and in feeble health but of sound and disposing mind and memory, and being desirous of making a disposition of my property, do make this my last will and testament:

1st. Having resigned my soul to God, I desire to be buried by the side of my beloved mother in the graveyard of the City of Columbus, and that her grave and mine should be suitably enclosed, and a tomb stone should be placed over each, and the expense be paid out of the money arising from negro hire.

2d. As I have received money and property from my guardian, John L. Lewis, for which he has no receipt, it is my will and desire that my executors do allow him a credit for ten thousand dollars, without requiring any vouchers from him, and also, that they allow him credit for his account for any money paid out for clothes, board, education and traveling expenses, horses and other things for me, on his making affidavit to the same, and also to give him credit for any receipts he may have of mine, which have not already been exhibited and allowed by the Court, and to allow him commissions on all, as if the same had been passed by the Court of Ordinary. And I do hereby request and appoint my said guardian John L. Lewis, to settle with Dr. James M. Lyon for negroes left me by my father, and desire my executors to give the proper receipts to Dr. Lyon according to the settlement so made by the said Lewis.

3d. I give and bequeath to my friend, and uncle William L. Wynn, as trustee, the following negroes, Simeon, a man, and Milly and their six children, and Major, Bob, Keziah, John, Ann, Phillis, Catherine, Ritt and Minerva, which are to be taken possession of as soon as convenient, and controlled and managed by him for the use and benefit of my sister Leonora Phoebe Lyon, until she shall marry or come of age, and when either event should happen, she is to have the possession of them if she desires it, and to have and to enjoy the use and hire of them for support, and to spend as she thinks proper for her benefit, and the support and benefit of her children, if she have any, and at her death the said are to be divided among her children equally share and share alike, and should my said sister die without leaving issue living at the

time of her death, my will and desire is that said negroes and their increase be equally divided between my aunt Margaret Phillips and my uncles on my mother's side.

4th. My will and desire is, that my friend William L. Wynn, should act as trustee for my sister, and that he should manage the property while in his possession, and appropriate the proceeds according to his best judgment and discretion for the benefit of my sister, and if he refuse, die, or fail to act from any cause, then I desire and appoint my uncle Dr. Jacob A. Lewis, to act in his place under the same trusts and with the same powers and authority, and I do not desire the property given to my sister to be in possession or under the management of any other person, unless both trustees above named die, refuse or fail to act, and in that event I desire the Court of Ordinary of Muscogee county to appoint some person of kin to my said sister on her mother's side to act as trustee.

5th. I give and bequeath to my little Cousin, William Smith Lewis, a negro woman named Mary.

6th. I give and bequeath to my little cousin, John L. Lewis, son of John L. Lewis, the lot of land in the "Cherokee purchase" drawn by the orphans of Isaac Phillips, and now belongs to me.

7th. I give and beqeath to my friend Robert A. Smith, my riding horse, saddle and bridle.

8th. I give and bequeath to my uncle Jacob A. Lewis, for his great kindness, care and medical attention to me for years past, my buggy and harness and a negro man named Clark, a boy named Byron, and the proceeds of Riley if sold, and if not sold, Riley himself.

9th. It is my will and desire that my executor do confirm a sale, by making titles to her trustees, I have made to my aunt Martha C. Lewis, of a negro girl about nine or ten years old, named Jane, for the sum of four hundred and twenty-five dollars, paid me by her at the time of signing this will.

10th. It is my will and desire that the balance of my property, both real and personal, and rights and credits be and remain in the possession of my uncle John L. Lewis, for his own use and benefit until the death of grand-father and grand-mother Lewis, and after their death that the same be divided equally between my aunt Margaret Phillips, and my maternal uncles. And lastly, I appoint William L. Wynn, and Noland R. Lewis, executors of this my' last will and testament. In testimony whereof, I have hereto set my hand and seal, this 18th day of January 1844.

In the presence of 　　　PEARCE A. PHILLIPS, [*L. S.*]

JOSEPHUS ECHOLS,

ANSEL L. WATKINS,

SEABORN JONES.

To the admission of this paper to probate and record, Thomas Morris, and Leonora P. Morris his wife, who was the maternal sister of deceased, and his sole heir at law, filed their caveat on the following grounds to-wit :

1st. Because said Pearce A. Phillips never published and declared said paper as his last will and testament.

2d. Because, if deceased ever did publish and declare the same as his will, he did not do the same voluntarily, but it was done under the undue and improper influence of John L. Lewis.

3d. Because, if deceased ever did declare said paper to be his last will, the same was procured to be done by the fraud, and undue influence of John L. Lewis and P. A. Lewis, and was not his voluntary act and deed.

4th. Because said Pearce A., at the time of the execution of said instrument, was of unsound mind and memory, and incapable of making a will disposing of his property.

5th. Because said Philips, at the time of making said will was a minor.

6th. Said pretended will is void and fraudulent, because more than half of his estate was bequeathed to John L. Lew-

is, his guardian, and the executors, therein named, directed not to require said guardian to account for the same.

7th. Because said John L. Lewis, the guardian of said Philips procured said will to be made, in order to protect himself and his securities on his guardian bond, from their liability, for the estate of said Philips in his hands.

8th. Because said John L. Lewis fraudulently and deceitfully persuaded said Pearce A. Philips to make said will, under the impression and belief made upon his mind, that his estate would be inherited by his relatives on his father's side, unless said will was made; when in fact, it was the wish of said Pearce A. to give a large portion of his estate, if not all, to his sister, Leonora P., and at the time believed that the larger portion thereof, was secured to his said sister, when, in fact, it had, by the fraudulent and deceitful representations and practices of said John L. been given to himself.

There was an appeal, by consent, from the Ordinary, to the Superior Court, of Muscogee County, and upon the trial the following testimony was introduced:

*For Propounders.*

*Col. Seaborn Jones,* sworn, says that Col. John L. Lewis called on him, and stated that Pearce A. Philips wished him to write a will for him. That, a short time thereafter, said Philips called on him, or he called on Philips, and Philips gave him instructions to write a will. That, under these instructions, he wrote the will in question. That, in company with Josephus Echols, he took the will and went to the house of said John L. Lewis, where Philips was living, who was then in bad health; that, there said Philips signed said will in presence of witness, and Josephus Echols, and Ansel L. Watkins, who subscribed in the presence of testator and of each other. Testator was of sound mind. John L. Lewis was a man of good sense, and I think able to exercise influence over the people in the county, because he was elected to

the Legislature several times; was kind and obliging to every one.

· *Josephus Echols*, sworn, says that he went with Col. Jones to witness the will. Testator was in feeble health; about 18 or 19 years of age. Some parts of the will were read to him; he seemed to understand it; was of sound mind; and signed the will in the presence of the subscribing witnesses, and they in his presence, and in the presence of each other. Lewis was a man of shrewdness and popularity, and exercised influence over those around him.

*Ansel L. Watkins*, examined by commission, deposed that he saw testator sign the will, and that he signed it in presence of testator and the other witnesses, who likewise subscribed in presence of testator and witness. Testator was of sound mind and memory. The will was made in the house of Lewis, and witness was called on by Lewis to witness the will. He lived a near neighbor to Lewis. Testator lived about a week after making the will; he had been sick some time.

Propounders then read to the jury an order from the minutes of the March Term, 1844, of the Court of Ordinary of Muscogee county, admitting said will to probate, in common form, and ordering it to be recorded.

*William Wynn*, examined by commission proved, that he never heard testator speak of the disposition of his property after making his will. Testator came to him before making it, and asked him to be executor and trustee for his sister—now Mrs. Morris—and stated he should leave her some 16 or 17 negroes; that that was as much as he wished her to have, and if she could not do on that and her own, she could not do on more; that he would prefer his uncle Langdon and grand-father to have the balance, as they had been harrassed in business, and had always been kind to him. John Butler, the husband of Leonora, received for her all the negroes left her by said will. Testator was as capable of making a will as any young man of his age; don't think he was in a state

to be the subject of undue influence. John L. Lewis did, and could not have had influence over him, and witness feels certain Lewis did not cause him, by any undue influence, to execute said will. Lewis was kind and affectionate to testator, and testator manifested great feeling for Lewis. Witness was nominated one of the executors, and trustee for Leonora. Testator was 18 or 19; thinks he made his will shortly after the conversation above refered to, and died two or three months after. Testator was then under the impression that he was worth between twenty and thirty thousand dollars. He owned sixteen or seventeen negroes, and if other property, it was in money or notes, in the hands of John L. Lewis, his guardian. John L. Lewis was his guardian.

*Jacob G. Lewis*, proved that he knew Butler, the first husband of Mrs. Morris. They married in the State of Alabama, the 6th of August, 1846, and all the property given in the will o her was delivered to Butler and his wife. The property was not all in Alabama; some was in the State of Louisiana, which Butler sold to Jacob Lewis; the names of the negroes Butler received were, Major, John, Bob, Simeon, Milly and six children, Kizy, Ann, Phillis, Minerva, Betty, Catharine; a part of which he sold, and a part he left in possession of his wife. Butler and wife were divorced in October, 1851, and Thomas Morris and Mrs. Butler were married the 11th July, 1853. Morris received Major, John, Kizzy, Phillis, Minerva, Betty and Catherine. Butler sold Simeon, Milly and six children. Bob and Ann died. Mrs. Morris was 23 years of age 26th June, 1854. Knows that testator did not have the utmost confidence in John L. Lewis. His relations could not exercise much influence over him; he was firm in his positions.

*Mary B. Duncan*, examined by commission, deposed, that testator was an intelligent youth of his age; about 19 years old; capable of transacting ordinary business. Mrs. Morris is the half sister of testator. She was first married in 1846. Married Morris in 1852. Knew of Butler and wife receiving

about sixteen negroes under the will, in 1847. John L. Lewis was guardian for testator.

Here the evidence for propounders closed.

### Evidence for Caveators.

Caveators first offered in evidence the following orders and proceedings of the Court of Ordinary, touching said paper.

March Term, 1844. The Court met pursuant to adjournment; present their Honors, George W. Ross, John M. Bethune, Josephus Echols, Kenith McKenzie, Justices, March 4th, 1844.

The last will and testament of Pearce A. Philips, deceased, having been duly proven, at this regular Term, in open Court, upon the oaths of Josephus Echols, Ansel L. Watkins and Seaborn Jones; it is ordered that the same be admitted to record.

Thursday, December 9th, 1852. Court of Ordinary opened according to adjournment. John Johnson, Ordinary, presiding.

Whereas, Thomas Morris having applied for letters of administration on the estate of Pearce A. Philips, late of Muscogee county, deceased, and notice of said application having been given in terms of the law, and it appearing that there is on file, in the office of Ordinary of said county, a paper purporting to be the last will and testament of said Pearce A. Philips, deceased, which was proven in open Court, at March Term, 1844, and ordered to be recorded, upon which no letters testamentary have been applied for, and no executors qualified, nor administration granted, and the said Thomas Morris having withdrawn his application, and William B. Stokes having applied for letters of administration on said estate, on motion, it is ordered that, said William B. Stokes be, and he is hereby appointed administrator, with the will annexed, of the estate of the said Pearce A. Philips, deceased, and the said William B. Stokes, having given bond in the sum of twenty-five thousand dollars, with Thomas Morris,

William M. Lee and Lewis M. Durr, as securities, which bond is accepted and approved by the Court, it is therefore further ordered that letters of administration, with the will annexed as aforesaid, do issue to said Stokes.

They next offered in evidence, the Act of the Legislature of the State of Alabama, divorcing Butler and wife.

*Wiley Williams*, sworn, proved that he had been appointed the attorney in fact, by William B. Stokes, the propounder, who had gone to Texas. That, on the 22d of May, 1855, Morris offered to return to him, as said attorney, certain negroes, named in a writing shown to witness; he declined to receive them. The negroes were not produced. He did not require it, and would not have received them if they had been.

Caveators then introduced and read in evidence, the bond of John L. Lewis, as guardian of deceased, in the penal sum of forty thousand dollars, and copies of his returns as guardian, from 1838 to 1840, showing in his hands about the sum of $25,000.

*W. B. Pryor*, swore that he knew testator; he was 16 or 18 years of age, and was a nephew of John L. Lewis. Lewis mentioned to him that, he desired him to write a will for testator, and would bring him to my office; that evening Lewis and testator came to witness' office. Lewis stated over the way which testator wished to dispose of his property, and Philips said it was right. Philips was diseased at the time he wrote a will, as directed by Lewis; did not think Philips would live long; he was pale and weak. John L. Lewis was a keen, shrewd, managing man.

*Thomas A. Brannon*, sworn, says that deceased lived with his uncle, John L. Lewis, who was his guardian; his capacity was below ordinary; his uncle indulged him more than most boys; his health was very bad. Lewis was a keen shrewd, managing man.

*James M. Lyon*, examined by commission, deposed that,

he married the mother of deceased. Testator died in 1844, leaving only a half sister, Leonora Lyon, now Mrs. Morris; he was born in 1829 or 1828, and died at the house of John L. Lewis, who was his guardian, and had his property.

To the following answer of witness, being read, propounders objected, viz:

"I think it was he, (John L. Lewis) told me he had applied to the Chancery side of the Court for an order to sell the property of testator. I replied, that the Court could not or would not give such an order, as testator's farther had willed the property to be kept together on the land, to cultivate it, for the benefit of his children. To which Lewis replied, I have consulted with Judge Shorter and Tom Foster, both of whom say, that if I prove it will be to the interest of the ward or minor to turn the property into money, the Court will make the decree; that a Chancery Court can do anything. He said he had given Foster fifty dollars to get the decree for him. I do not recollect that he said he had employed Shorter; my impression is, he did not."

The Court sustained the objection, ruled out the answer, and caveators excepted.

Propounders objected to the reading of the following portion of the answer of the witness, viz:

" Col. Lewis informed me that he had obtained the decree for selling the estate of his ward, and that it was to be sold in February, 1839, to the best of my recollection, and asked me to attend the sale, but it was not convenient for me to do so."

The Court sustained the objection, and caveators excepted.

Same witness, (Lyon,) further deposed that after the failure of Lewis, he sold testator a number of negroes. Lewis furnished him a horse and buggy; his mother and witness directed his schooling till 1839, when Lewis took him and put him to school.

Propounders objected to the following answer of the witness.

" I have stated before what the guardian did about the sale of the land, negroes, and other property of the estate ; he had them sold, or it was done at his instance; he told me so."

The Court sustained the, objection, and excluded the answer, to which caveators excepted.

Witness further deposed that testator told him that his uncle Langdon got Col. Jones to write a will for him. That Col Jones had to write two, or three, or four wills, before he suited his uncle Langdon ; to best of his recollection, three. This conversation was the second or third day before the death of testator. The ostensible means used to acquire influence over him, was the free use of money ; it was furnished without stint; he had often heard testator say, after the death of his mother, how he intended to dispose of his property. He was unsound in body from infancy; had a disease from both ears, which continued till his death. He often spoke of the disposal of his estate, and often stated to his mother that, after his death, she should have all his property for life, and that then it should go to his sister Le. After the death of his mother in February, 1843, he stated that he intended his mother to have all his property, but that now he would make Le. independent ; that she should have all his estate. About first January, 1844, testator came to see me; was then a consumptive; it seemed to be his business to speak of his health, his sister and his estate. He said that, since his mother's death, his sister Le. was his only heir ; that if he had twice as much, she should have it all; that she should have every thing he had.

Propounders objected to the following answer of the witness :

"Not long after this, Col. Lewis told me that Pearce was confined at his house, and wished to see me; not thinking of his being so low, I did not go that day. The next morning Leonora came to my house and said that her brother said he was very anxious to see me, and that if I did not go soon, he was sinking so fast, he would not be able to

say to me what he wished. I was much surprised to hear of his being so low; told her to return, and that I would come soon."

The Court sustained the objection, and caveators excepted.

Witness further deposed, that he went; found him in bed, with no one present but his sister. She soon left, and deceased said, that since he had seen me, a great change had taken place in him. That his uncle Langdon had got Col. Jones to write a will for him, and that he had to write it three times before it would suit his uncle Langdon; Mrs. Lewis then stepped in, and he stopped; she remained in the room till witness left, and testator said no more, and died on the third day thereafter.

To the following portion of this witness' answer, propounders objected, viz:

" Col. Lewis told deponent that Col. Jones had written it, and said that Col. Jones said that he could sustain it before any Court."

The Court sustained the objection and excluded the answer, and caveators excepted.

To the following answer of this witness, propounders objected, viz:

At my office, on broadway, John L. Lewis visited me, and Pearce's will was the subject of conversation. It is the only place that I can precisely locate a conversation at, although it was a continuance of a conversation on Broadway, at or near Fogle's jewelry store, which was a continuation of a former conversation. In the first conversation, I asked him if Pearce had made a will; he said he had, and told me of some of the bequests; to which I replied, you ought not to have had such a will made, (being convinced from what Pearce had said to me that it was not his will, but his uncle Langdon's; that his uncle Langdon had got Col. Jones to write, for Pearce to sign as his will.) I said it was unjust; if Pearce had been let alone, Le. would have heired his estate; that he always said she should have it. He replied, " she

will get enough any how." Some time after that, we met near Fogle's jewelry store, or where it used to be, near where the old Insurance Bank house was, and he said, in relation to Pearce's will, he consulted Judge Sturgis before it was written, who told him that if no will was written, the Philips family would heir the whole estate, (I think in this conversation we went up into the room over the jewelry store, of which I have before spoken.) I told him I did not believe it, and thought the will could and ought to be broke. He replied that the connection between Pearce and Le., being on the mother's side, would cut her off entirely, if the will was set aside. I said I believed the nearest kin would heir, and there could be no doubt of a half-sister being nearer than uncles and aunts. About then, we parted, with some little excited feelings. On the next Saturday deponent had appointed to leave for Mississippi. On Friday morning Col. Lewis visited me, at my room, on Broadway. After some little conversation, he renewed the former conversation about the will. I told him that the will ought to be broke; that it was not Pearce's will, unless he had changed his mind very much, since he had talked with me early in January, for then he said Le. should have every thing he had. Col. Lewis replied, that the will will stand. Col. Jones says that he can sustain it in any Court; and if it can be broke, would you be willing to let it be done, thereby letting the Philipses heir the whole estate. To which I replied, it is folly to talk to me in that way; I cannot believe it. Then he offered to bet me a hundred dollars, and leave it to Judge Sturgis, that if the will should be broke, the Philips family would heir the whole estate. I then said, you know I am going away to-morrow, to be absent several months, and cannot attend to anything of that kind now. And he exultingly, said, "Seab. Jones can sustain it in any Court." The next day I left, and have not been back since; but I then expected to be absent but a few months.

On the night after the burial of Pearce A. Philips' mother,

Pearce A. Lewis and James Philips slept in the same room with deponent, at deponent's house; they occupied the same bed, and deponent another, made on the floor. Mrs. Lewis and Philips, and perhaps other ladies, occupying the only other bed room in the house. At a late hour, when all was as still as death, and apparently asleep, deponent heard James Philips say, we must manage to draw Pearce from any influence of Dr. Lyon, to which P. A. Lewis said, yes, that must be done. Philips then said, Langdon will be best to use for that purpose, won't he? Lewis replied, no, Dr. Jacob is better; he can get Pearce to come over to hunt with him, and we can always manage to keep him there, by keeping him entertained, hunting and staying amongst us, shifting about, so that he will not tire of the country, till he gets weaned from Columbus. Langdon lives in Columbus, and would not answer our purpose so well as Jacob; and he is very fond of hunting with Jacob, and by that means we will have him among us. Philips said, that is the very thing; you must attend to it, and see that Jacob gets him over as soon as he returns, to which Lewis said, "I'll attend to it."

To which propounders objected. The Court sustained the objection, and caveators excepted.

Witness further deposed, that Mrs. Morris was his daughter, and that deceased, Pearce A. Philips, was the son of his wife, by a former husband.

Here caveators closed.

### For Propounders.

*B. V. Iverson,* proved that he knew testator; he was a young man of ordinary capacity. Lewis was a kind man to him, and to every one around him; Lewis was a lawyer. He had seen testator make trades which exhibited some shrewdness.

*Levi Jones,* proved that he knew testator a long time considered him a young man of good sense, well qualified to transact any business—better than most young men; that he was of sound mind; that he was present when the will was

signed and written; testator fully understood it, in his opin
ion; knows of no influence exercised over him; has seen
John L. Lewis and received a letter from him.

Here propounders closed.

The Judge, amongst other things, charged the jury, that a
minor may make a will; males at fourteen, and females at
twelve; sanity is presumed; it devolves upon caveators to
show incapacity.   The law gives every man the power to dis-
pose of his property as he chooses; he may give to any one
he pleases; he may disinherit his own wife and children, and
give his whole estate to a stranger.   Was the testator *non
compos* when he made this will?   A *non compos mentis* the
law defines to be one wholly deficient in understanding, or
one, who by grief, sickness or other accident, has wholly lost
his understanding: All persons, except idiots, lunatics, and
those who are *non compos mentis*, of lawful age, and not un-
der constraint, are competent to make a will, be their under-
standings ever so weak.   Courts and juries in passing on a
will, do not measure the extent of the testator's mind, for if
he is not totally deprived of reason, whether he be wise or
unwise, he is the lawful disposer of his property.   A man's
capacity may be perfect to dispose of his property by will, and
yet inadequate to make contracts for the purchase and sale of
property.   It is sufficient, if the testator has mind and memo-
ry to understand the business in which he is engaged; the
property he means to dispose of; the persons who are the
objects of his bounty, and the manner in which it is to be
distributed between them.

It is not unlawful for a person by honest persuasion to pro-
cure a will in favor of himself or another; neither is it, to in-
duce the testator by kindness or fair and flattering speeches.
Though persuasion may be employed to induce the disposi-
tion in a will, this does not amount to that sort of influence,
which in law will vacate a will. . For instance, if a wife by
her virtues has gained such an influence over her husband,

that her good pleasure is a law to him, such an influence can never be a reason for impeaching a will made in her favor. The influence to set aside or vacate a will must be an unlawful importunity on account of the manner and motive of its exertion, and by reason of which the testator's mind was so embarrassed and restrained in its operations, that he is not master of his own opinions in respect to the disposition of his property. If by acts of kindness, Lewis procured the will to be made, that will not vacate it. If he provided him with horses, money, jewelry and fine clothes, with a view to procure the testator to make a will in his favor, that will not amount to such undue influence as to vacate this will. Undue influence in its correct legal acceptation, must be of such a degree as to take away free agency; it must be such an influence as the testator was too weak to resist; such a will as is not the act of the deceased. The influence to impeach a will, must amount to force and coercion, destroying free agency; it must not be the influence of affection and attachment; it must not be the mere desire of gratifying the wishes of another, for that might be a very strong ground in support of the will, for we prefer that those we love most should enjoy our property. It must appear that the importunity amounted to coercion tantamount to force and fear. When a guardian procures a ward to write a will in his favor, to sustain such a will, it devolves upon him to show that the ward had sufficient capacity to make a will, and further that the ward made it of his own free will and choice.

A man may make a will in favor of his guardian, and if it appears that the ward at the time, had testamentary capacity, and was master of his own actions, and was not circumvented by fraud, such a will shall stand just as if it had been made in favor of any other person. If the proof shows that John L. Lewis was the guardian of the testator, that he took a considerable bounty under its provisions; that he procured the will to be written; that he had great influence over the mind of testator; that at the time of executing the will, testa-

tor was on his death bed; that his mind was weak; that he was suffering from some bodily affliction; further, if the proof shows that John L. Lewis showed a great desire to have the will written, and it contains a disposition of property different, from his declared intentions in health, and to which he had long adhered; to support such a will, proof must be clear and satisfactory as to capacity and volition, and without such proof, you must find against the will. But if the proof shows that Lewis was the guardian and had great influence over testator, and used this influence to procure the will to be written, and was kind and indulgent to him, and though testator was on his death-bed, and was suffering under some bodily disease when he wrote the will, and Lewis persuaded him to make it, yet if the proof is satisfactory that he acted of his own accord and volition, and that he was of testamentary capacity, and no fraud was practiced upon him, then you must find in favor the will.

To all of which charge, and each and every part thereof, caveators excepted.

· The jury found for the will, and counsel for the caveators tender their bill of exceptions, and assign therein as errors the rulings, decisions, and charge above excepted to.

JAMES JOHNSON and WILLIAM DOUGHERTY, for plaintiffs in error.

HINES HOLT and SEABORN JONES, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

The two points made upon the record in this case are,

1st. The rejection of the sayings of John L. Lewis, the uncle and guardian of the testator, and one of the principal legatees under the will.

2dly. The mis-direction of the Court in its charge to the jury.

For as to the midnight communication overheard by Dr.

Lyon, in which the Lewises, the Philipses and the Pearces were the interlocutors, we do not think that it amounts to anything, as there is no proof that the conspiracy then and there concocted, was ever executed. None of the persons therein implicated seem to have exerted any influence over the testator; on the contrary, John L. Lewis, as far as the testimony discloses, seems to have circumvented and defeated their plan. It may be, that owing to the defective manner in which the case is brought up, in conformity to the Act of the last Legislature, as counsel contends, but a misapprehension of it, as we hold, all the evidence is not before the Court, which might if here, show the applicability of this testimony. That is not the fault of this Court, nor of the Court below. If parties, to save a little expense and trouble, will " simplify and curtail" until enough is not left to demonstrate affirmatively that the judgment below is erroneous, it must stand. It is presumed to be right until the contrary appears, and the *onus* is upon the plantiff in error.

[1.] Were the sayings of John L. Lewis, a principal legatee, and a real, though not a formal party to the record, admissible ?

We are called on for the first time to decide this question. It has become a settled rule of this Court, that the admissions of the propounder of the will, who is also a legatee for a large amount, may be proven. And this proposition is abundantly sustained by authority. But here the will is propounded for probate, by another. Can the sayings of a principal legatee be received in this issue ?

We think so, in all cases, so far as his own interest is to be affected. And the jury, upon sufficient proof, may strike out his legacy and establish the balance of the will, so that a will may be good as to one party, and bad as to another; valid as to some parts and invalid as to others, *Trimlestown vs. D'Alton*, 1 *Wms. on Ex'ors*, 43; 1 *Dow. new series* 85, decided in the House of Lords, on appeal from the Irish Chancery. Beyond this we cannot find sufficient authority to go.

There is one reported case in Massachusetts, which goes to the extent of allowing the testimony to come in, so as to affect all who take under the will, 1 *Pick. Rep.* 192: But it is unsustained, and is considered irreconcilable with the general doctrine laid down, both there and elsewhere. Let a community of purpose or joint interest be first made out between all the legatees, and then the admission of one may bind the rest, not otherwise. It is said, that if the will was procured by fraud or undue influence, that the whole will must fail, and the innocent legatees suffer in common with the guilty. True, but how is the fraud or undue influence to be established? By independent proof and not by acknowledgements of one of the parties. Take a stronger case. Here is a will coerced by the duress of A. A. and B. being both legatees. Is it allowable to prove the duress by the confessions of A. to the prejudice of B.? Upon principle, we hold not. *Phelps vs. Hartwell,* 1 *Mass. Rep.* 71.

[2.] Now, any acts or declarations in connection with those acts, by John L. Lewis, in reference to the will, are competent evidence. His application to counsel to write a will for Philips, and what he said at the time, as well as what he did, can be testified to, even should the effect be to set aside the whole will. This testimony stands upon a different footing.

[3.] The answer of Dr. Lyon, that "*he thought*" it was John L. Lewis, that told him so and so, is objectionable for uncertainty. He ought to be positive that *it was* John L. Lewis that made the statements to which he testifies. The repetition of mere oral statements is subject, at best, to much mistake, and can only be satisfactory when deliberately made and precisely identified. It would seem therefore, that there ought to be no uncertainty as to the person who made them.

Our first impression was, to exclude the proof of the decree in chancery, and the sale under it, for irrelevancy; but, up-

on further reflection, we concluded, that as it was a breach of trust, on the part of the guardian to obtain this decree, and sell the property under it, it might serve to show the strong motive he had to procure the will to be made for his indemnification.

[4.] We see no sufficient reason why the long dialogue which was held at sundry times and places between Lyon and Lewis should not the whole of it, be admissible. Lewis understood distincly what Lyon charged. He had an opportunity of speaking and denying it. It was calculated to call forth a reply from one so situated, and yet, to many things said, he was silent—others he answered. His passiveness must be construed into acquiescence as to the rest. Indeed he admitted the main facts, and justified himself upon the ground, that it was necessary to get the will made to disinherit the Phillipses. This was a feigned reason, and Lewis was too intelligent not to have known it.

[5.] We come now to the charge of the Court.

Respecting the sanity of the testator, the Court charged that, " be the testator wise or unwise, yet he was capable of willing his property unless totally deprived of reason." It is complained that the rule thus stated, as to the standard or measure of testamentary capacity, is wrong.

We are not prepared to say that even this language is too strong. The English Courts say upon this subject, " Courts will not measure the degree of understanding, and say that a weak man, *provided he is out of the reach of a commission,* may not give as well as a wise man," and case upon case can be cited which go to the extent of deciding that unless the failure of understanding be quite total, reaching to the testator's forgetfulness of his immediate family and property, he is not disqualified from making a will. The weak have the same rights with the prudent and strong-minded, to dispose of their property; and if imbecility, and not a total absence or perversion of mind, should constitute inability to act, it is impossible to draw any clear line of demarcation—

one which would be practicably available. At the same time, I would add, that weakness of mind, which does not amount to testamentary incapacity, may be given in evidence, for the purpose of showing, that the testator might, for that reason, be more easily influenced by others. Nay, more, if it be made out by proof, that a dominion is acquired by any person over a mind of sufficient sanity, for general purposes, and of insufficient soundness and discretion to regulate his affairs in general, yet if such a dominion or influence were acquired over him, to prevent the exercise of such discretion, it would be equally inconsistent with the idea of a disposing mind, and would certainly destroy the will.

The Courts, after all that has been said and written upon this subject, have shed but little additional light upon the old English rule. Their disquisitions have served to furnish materials for digests and treatises; still the rule is, if the testator be not lunatic, idiot or *non compos mentis*, he may make a will, so far as capacity is concerned.

The Court further instructed the jury, that as to the character of the influence, which would invalidate a will, that it must amount to "force and fear." It is objected that this is too strong.

Upon this point also, no tangible distinction can be attained. The only test is, is the testator's free agency destroyed? Does he cast a stealthy and timid glance at the party controlling him, and seem to breathe freer in his absence? Who has not seen the down trodden wife cower and tremble under the look of her lord? One thus subjected to the dominion of another, should scarcely ever be allowed to make a will in their favor. But Mr. Williams uses the very words employed by Judge Worrill, he says: "There must be proof that the act was obtained by force and coercion, by importunity which could not be resisted, that it was done merely for the sake of peace, that the motive was tantamount to *force and fear*." 1 *Wm's on Exr.* 39.

The only other point made upon the charge is, that the

Court instructed the jury that "if by acts of kindness, Lewis (the guardian,) procured the will to be made, that will not vitiate it. If he provided him with horses, money, jewelry, and fine clothes, with a view to procure the testator to make a will in his favor, that will not amount to such undue influence as to vacate the will."

Perhaps of itself it would not. Certainly it would not, as between persons occupying a different relation toward each other, than that of guardian and ward; and not necessarily perhaps even in that case, provided the indulgence shown to the ward was such as was justifiable, considering his estate and condition in life. But it will never do, for this or any other Court, to endorse the doctrine that a guardian may squander the property of his ward, in procuring for him injurious indulgences, and that for the purpose of inducing the ward to give him his property. Whether the articles referred to in the charge were suitable for the ward, we cannot say. A young man at his age and of his fortune is, in my opinion, entitled to wear a gold watch, to have fine clothes, to keep his gun and dog; and I would say his horse and buggy, especially considering that he was an invalid. The proof in the record is silent as to the extent of this expenditure, some allusion is made to it by the testator himself, in the second item of his will, in which he says :

"I have received money and property from my guardian, John L. Lewis, for which he has no receipt. It is my will and desire, that my executors do allow him a credit for ten thousand dollars, without requiring any vouchers from him; and also, that they allow him credit for his account for any money paid out for *clothes*, board, education and traveling expenses, *horses and other things for me*, on his making affidavit to the same. And also, to give him credit for any receipts which have not already been exhibited and allowed by the Court, and to allow him commissions on all, as if the same had been passed by the Court of Ordinary," &c.

We must think the charge upon this point, without qual-

ification or explanation was too broad: the influence of a husband over his wife, who has a separate estate to dispose of by will, an attorney over his client, and a guardian over his ward, are all looked upon with the same suspicion and disfavor by the Courts.

*In Huguenin vs. Baseley,* 14 *Ves.* 273, The first head note is "voluntary settlement by a widow upon a Clergyman and his family set aside, as obtained by undue influence and abused confidence in the defendant, as an agent undertaking the management of her affairs, upon the principles of public policy and utility, applicable to the relation of *guardian and ward."*

So, Sir Samuel Romily, and the eminent counsel, who argued that case, contended that the authorities against permitting a transaction of bounty, to take effect between persons standing in certain relations are numerous, and that amongst those relations, that of guardian and ward is not for this purpose confined to persons so related in a strict sense, as under an appointment of guardian by will or by order of the Court, but that the rule included any person placing himself in that situation. *Ib* 279, 280.

Thus it will be perceived, that the abuse of influence growing out of the relation of guardian and ward, is put uniformly as requiring more watchfulness than any other, and any gift from the ward to the guardian, will be more thoroughly scrutinized and sifted than any other.

The case of *Pierce vs. Waring,* cited in *Gray against Mansfield.* 1 *Ves. Sen.* 379, is a striking illustration of this doctrine, Waring was guardian of a Mr. Hall, who lived with him, had horses, dogs, &c., kept by him ; Hall's visitors were all entertained at Waring's own house, when Hall stood candidate for Ludlow. After coming of age, Hall made Waring a gift of £3000 East India stock, for his many kindnesses and services. Hall was satisfied with the gift and did not dispute it, but his representatives after his death brought a bill to set it side. There was no proof of imposition, the only circum-

stance was by conjecture, as if Hall did not know what the stock was worth.  The Lord Chancellor, November 13, 1745, set it aside, upon the general principle, not upon the not knowing that it was worth more, but that it was a consideration for which he would be allowed nothing in that Court; that it was a dangerous example, and he would not endorse a gift to be obtained on these circumstances after the coming of age.

Similar examples could be adduced to an indefinite extent. But it is insisted that this doctrine applies to deeds, and not to wills.  Wherefore?  Why to the one more than the other ?  These adjudications are put upon the ground of public policy.  Is there any difference in this respect between deeds and wills?  In Waring's case, Lord Hardwick said, " Waring had been concerned as guardian, and as soon as the infant came of age, made up the account and retained that gratuity to himself, the same influence of the guardian continuing, being done when his effects were to be delivered over.' 2 *Ves. Sen.* 260.  Was not this influence existing much more potentially, while the ward of Lewis, was still a minor, and the relation of guardian still subsisted ?  Will a deed made even after the ward has come of age be set aside, and a will made during the infancy, not be questioned ?  Counsel have submitted no authority to justify any such distinction. I have met with none.  On the contrary, in *Ingram vs. Wyatt*, 3 *English Ecc. Rep.* 167, I find these very cases, which I have cited, and others quoted by Sir. John Nicholl, to show in cases of *wills* with what particular jealousy and anxiety, Courts will guard all persons occupying these fiduciary relations, from the abuse of that influence which must necessarily result from it.  That an infant of fourteen years and upwards is capable of disposing of his personal estate by will, is a well settled doctrine of the common law.  Testaments of this sort are rare however, not because it seldom happens that minors have property to dispose of, but because they are generally willing that the wise disposal of the law should take

its course, and the feeling of the country is against it. Still, if one chooses to exercise this right, he is entitled to do so. I do insist however, that considering the want of discretion in minors, which may appear from the disposition actually made of their effects, as well as from other circumstances, the Court should exercise great caution in seeing to it, that all is right, especially when the estate has been diverted from the channels, which the law has established. In such a case, the law will be still more jealous to protect the unwary against undue control, especially where a relation of confidence like that of parent and child, husband and wife, client and attorney, guardian and ward, exists.

Judgment reversed.