## TURNIPSEED vs. CUNNINGHAM.

1. Courts of Equity incline against conditional sales, and where it is doubtful from all the circumstances attendant on a transaction, whether a conditional sale or a mortgage was intended, Equity will treat it as a security merely.
2. Where it is doubtful whether a transaction was intended as a conditional sale or a mortgage, it is the duty of the purchaser, who insists upon the former, to show clearly that such was the intention of the parties at the time of the transaction.

Error to the Chancery Court of Pickens.    Before the Hon. David G. Ligon, chancellor.

ORMOND & HUNTINGTON, for plaintiff:

1. A deed absolute on its face will not be declared a mortgage, or conditional sale, but on the most stringent and conclusive proof. The early cases in this court declare the law, that a contract absolute on its face may be shown by parol to be a mortgage or conditional sale. Subsequent cases limit and explain the doctrine broadly asserted in the earlier decisions, as will be seen by an analysis of the cases of Eiland v. Radford, 7 Ala. 727; McKinstry v. Conly, 12 Ala. 678; Freeman v. Baldwin, 13 Ala. 246, and Chapman v. Hughes, 14 Ala. 218. See also Robinson v. Cropsey, 2 Edw. Ch. 138.

2. The answer denies that a mortgage was intended, but admits that the complainant had the right to repurchase, and there is but one witness, the son of the complainant, who proves that it was intended as a mortgage. The evidences of debt were all cancelled and *delivered up* to the complainant. The weight of the evidence is decidedly in favor of the answer, that it was an absolute sale with a right of *repurchase*. See also Goodman v. Grierson, 2 Ball & B. 274, to the effect

that there can be no mortgage where the remedies of the mortgagor and mortgagee are not mutual and reciprocal. In the case at bar, the notes having been paid and delivered up, Turnipseed could have had no action for the consideration if the negroes had died.

3. The only ground which Cunningham sets up for relief is, that Turnipseed has chosen to treat as absolute bills of sale which were made absolute for the purpose, confessedly, of defrauding the State of her just revenue. By the bill itself, therefore, the parties being in *pari delicto*, neither can obtain aid from a court of chancery.—2 Story's C. Eq. 45; Hannay v. Eve, 3 Cranch, 242; Fambro v. Gantt, 12 Ala. 298; Weaver v. Whitney, Hopk. Ch. 11.

4. Money paid in pursuance of an usurious contract cannot be recovered back, (see pamphlet acts of 1844,) and equity will not aid a man in doing that indirectly which the law does not permit him to do directly.

5. In McKinstry against Conly, (*ut sup.*) the court lay great stress upon the fact, that before the conditional sale was entered into, a mortgage in fact existed, and asked where was the necessity of a new mortgage. Here there was a deed of trust covering four hund ed acres of land and sixteen negroes, of which deed the law day had arrived—whence, then, the necessity of a new mortgage which is a less stringent remedy for the collection of debts?

6. If the parties intended a conditional sale, their intention will be carried out: to refuse to enforce it when they contracted in that view, would be, in the language of the court in Conway v. Alexander, Cranch, to " assume the guardianship of adults."

Peck, for defendant:

1. As to the character of the transaction as disclosed by the answer.—1st. It admits that the relation of debtor and creditor existed between the parties at the time of the alleged sale. 2d. It admits the plaintiff in error did not wish to purchase the slaves—did not wish to invest his money in that way; had no use for the slaves. 3d. It admits that the prices fixed upon the slaves were not equal to their true value. 4th. The criterion adopted for the hire was not the value of the services of

the slaves, but the profits which Turnipseed thought he ought to demand and receive upon his investment.

2. If the answer leaves the question, whether the transaction was intended as a conditional sale or mortgage, in doubt, the testimony fully establishes it to be a mortgage.

3. Where it is doubtful whether a transaction is a mortgage or a conditional sale equity construes it a mortgage.— 4 Kent's Com. 144, and cases cited in note; May v. Easton, 2 Porter, 421; 1 Dev. Eq. 372; 2 Sumn. Rep. 535. So too, where it is doubtful whether a sale is absolute or a mortgage, if the property is of much greater value than the price paid, it will be held to be a mortgage. Todd v. Hardie, 5 Ala. 698; ib. 9 24.

DARGAN, J.—The material allegations of the bill are, that the complainant Cunningham, was indebted to the defendant in several promissory notes, to secure which, a deed of trust had been executed by the complainant to Edmund T. Bush; that the defendant on the 23d of March 1843, claimed to be due to him the sum of six thousand eight hundred and twenty-five dollars; that this amount was produced by calculating interest on the debt at sixteen per cent, and compounding it from time to time; that the defendant then stated that the Legislature had passed a law taxing money loaned at interest, or used in shaving, and that he wished to change the character of his debt, and proposed to give up the deed of trust and the notes, and to take bills of sale for twenty-four negroes, assuring the complainant that he would hold the bills of sale as a security for the debt, and that the slaves should remain in the possession of the complainant, and that he would take a note purporting to be for the hire of the slaves, but intended in fact as a security for the interest. The bill further charges, that confiding in the assurances of the defendant, that he would take no advantage of complainant, he executed to him five bills of sale, purporting to convey the slaves absolutely, and that the defendant then delivered up the deed of trust and the notes to complainant, he at the same time executing his note to the defendant for the sum of eight hundred and eighty-eight dollars and ninety-nine cents, purporting to be given for the hire of the slaves, but which was intended to

secure usurious interest on the debt due by complainant to
the defendant. It is further alleged, that on the 22d May
1843, the complainant executed to the defendant another bill
of sale for a negro named York, the consideration expressed
being four hundred and fifty dollars, which, however, was ex-
ecuted on the same terms and conditions, and on like assur-
ances. The consideration for this bill of sale was money paid
by defendant to different persons, at the request of the com-
plainant. The bill further alleges, that on the 2d day of
March 1844, the day after the note for $888 99 became due, the
defendant' induced the complainant to execute another note,
purporting to be for the hire of the slaves, but intended to se-
cure usurious interest, which was for the sum $956 99, and
which included sixteen per cent on the amount, expressed to
be in payment of the slave York. It is further charged that the
amount actually due, including lawful interest, after allowing cre-
dits for two payments, is about five thousand three hundred and
ninety eight dollars and seventy cents; and that after the last note
fell due, the defendant in violation of his assurances commenc-
ed actions at law, to recover the possession of the slaves and
the amount purporting to be due for the hire. The bill con-
cludes with a prayer that the bills of sale be decreed to be mort-
gages; that an account be taken of the amount actually due
with lawful interest, on the payment of which the bills of sale
to be cancelled, and also for injunctions against the suits at
law, and for general relief.

The answer admits that complainant was indebted to the
defendant, to secure which the deed of trust described in the
bill was executed; the complainant had made default in pay-
ing the notes as they fell due, and that the defendant was
about to proceed to have the property sold; and avers, that
the complainant, desirous to prevent his land conveyed by
the deed from being sacrificed, proposed that the defendant
should pay off some executions then against him, amounting
to about one thousand and thirty-six dollars, and give up the
notes and deed of trust, and that he would sell to the defen-
dant absolutely, negroes to satisfy his demand :—that to this
proposition the defendant agreed, but told the complainant,
that he preferred the money to the slaves, as he had no land
for them to work; that complainant replied he was willing to

Turnipseed v. Cunningham.

hire them of respondent; that the defendant then went to the house of the complainant, and the negroes were valued by them, and after the valuation, defendant said to complainant that if he would, at any time, previous to the first of March 1845, pay the sum agreed on as the value of the slaves, and the stipulated hire, he might have the negroes back,—but he denies that the bills of sale were intended as mortgages, or to secure the payment of a debt, or that there was any promise or undertaking on the part of the complainant to repay to the defendant the purchase money on the valuation set on the slaves.  It is also denied that the notes, purporting to be given for the hire of the slaves, were intended to secure usurious interest on the debt, but it is insisted that they were intended to secure the hire of the slaves, as they purport to do.  It is likewise denied that the bill of sale for York was intended as a mortgage, but it is insisted that the sale was absolute, with the same right on the part of complainant to repurchase him that he had to repurchase the others.  It is admitted that the hire of the slaves was ascertained by a certain per centage on the sums agreed to be given for them; that this was twelve and a half per cent on the amount that complainant previously owed to the defendant, and sixteen per cent that the defendant then advanced for the complainant; but it is averred that this criterion was not adapted to secure usurious interest on a debt, but as a criterion by which the value of their services or hire was ascertained.  The answer also admits that the defendant had reserved and agreed to take usurious interest on the debt due him, and this usurious interest formed a portion of the indebtedness of the complainant to the defendant at the time the bills of sale were executed.  The answer also avers, that on the first of March 1844, the complainant, at the request of the defendant, brought the slaves to the residence of William Ellis, and there, in the presence of witnesses, made a formal delivery of them to him, by placing his hand on one, and saying, I deliver you these slaves as your property, after which the complainant again hired them for a year, ending the first of March 1845.

In addition to the admissions in the answer in regard to the right of the complainant to repurchase, the testimony clearly shows, that on the day the slaves were brought to the house

37

of Wm. Ellis, and after the complainant had announced that he delivered them to defendant as his property, the defendant deliberately stated to those who had been requested to witness the delivery, that the complainant had the right to redeem one or all of the slaves for his own benefit, or for the benefit of his family. The transaction must therefore have been either a sale with the right to repurchase, or a mortgage; and on the solution of the question, whether the bills of sale were intended as mortgages to secure the amount of indebtedness due from the complainant to defendant, or whether they were intended to be absolute, with the right of repurchase merely, depends the equity of the bill, and the rights of the complainant.

Courts of equity are said to incline against conditional sales, and where it is doubtful, from all the circumstances attendant on the transaction, whether a sale, with the right to repurchase, or a mortgage was intended, equity will construe it to be a mortgage, for by this construction, complete justice can be done to both parties; but in cases of conditional sales, oppression can be frequently exercised over the needy, and unjust advantages taken of them, owing to their distressed or embarrassed condition.—Flagg v. Mann, 2 Sumn. 535; Longust v. Seaman, 1 Ves. 406; 5 Little, 84; Poindexter v. McCowan, 1 Dev. Eq. 373; Powell on Mortgages, 139; 2 J. J. Marshall Rep. 471. It is therefore the duty of the purchaser, who insists that the sale was absolute, with the right of repurchase, and not a mortgage, clearly to show that such was the intention of the parties; if the proof leaves it doubtful whether the one or the other was intended, a court of equity should decree the contract a mortgage. Weighing the evidence and the entire case by this well settled rule, in my opinion, the bills of sale must be declared mortgages, for any mind, viewing the whole case deliberately, must doubt whether the bills of sale were to be absolute, with the right to repurchase, or whether they were intended as mortgages, even if it be not convinced beyond doubt, that a mortgage alone was intended.

The slaves are shown to be worth nearly double the sum fixed on them as their value, and this of itself must always be an important fact in determining whether a sale is absolute, or a mortgage. The complainant was the debtor of the de-

fendant, and to secure this debt, a deed of trust had been exe-
cuted on the property of the complainant, default in the pay-
ments had been made, and the defendant had given notice
that he intended to sell. The agreement was then entered
into between the parties by which the defendant was to ad-
vance a further sum of about a thousand and thirty-six dol-
lars to satisfy executions then existing against the complain-
nant, and also to give up the notes he held on complainant,
together with the deed of trust, and in lieu thereof, the defend-
ant was to receive bills of sale for twenty-four or five slaves.
But there was no witness to the agreement; it rested with the
parties themselves. The answer shows that the agreement
was fully understood and complete as to all its terms before
the day on which the bills of sale were executed, and on that
day nothing was said in reference to the value of the slaves,
for they had been previously valued; nor was any thing said
in reference to the hiring of the slaves, but the note for hire
was drawn and executed in pursuance of the previous un-
derstanding. This note, which purports to be for the hire of
the slaves was, not regulated as to the amount by the value of
the services of the slaves, but by a certain per centage on the
amount of indebtedness to the defendant; at the expiration of
the year, the complainant, in the presence of witnesses, de-
clares that he delivers the slaves to the defendant as his pro-
perty ; the defendant then calls on the same witnesses to wit-
ness that the complainant had the right to redeem one or all
of the slaves, and another note is taken for hire, the amount
of which is regulated by the same rate of interest on the amount
of the debt. The conduct of the parties from the time the bills
of sale were executed, tends strongly to show that they con-
sidered the slaves as bound for the debt, otherwise their hire
it would seem would have been to some extent regulated by
the value of their services ; but the hire of York, a likely boy
about 19 years old, is estimated at 16 per cent on $450, and
the hire of the others is estimated in the same manner, whether
they were able to perform services or not. In addition to
these circumstances, James Cunningham, the son of the com-
plainant, states in his deposition, that when the slaves were
brought into the yard to be valued, he inquired of the defen-
dant the meaning of it, who replied that the notes he held on

his father were due, and the money was taxable, and that he was going to fix certain prices on them and *take forms* of bills of sale, and by so doing he would avoid the taxes on the notes, and that witness need not give himself any trouble about it.

Under this proof we find so many *indicia* of a mortgage, that we must so consider the transaction, notwithstanding the notes and the deed 'of trust were delivered up to the complainant by the defendant, on the execution of the bills of sale. The relation of creditor and debtor existed between the parties at the time of the transaction; the value of the property is nearly double the amount agreed to be given, and the possession continued with the vendor, under a contract of hire, as the defendant insists; but this contract of hire seems to have been a. part of the contract of purchase, and the sum agreed to be paid by way of hire is a certain per centage on the amount of the debt.

These *indicia* of mortgage, connected with the declarations of the defendant, deliberately made, that the complaint had the right to redeem the slaves in the presence of men called on to witness the formal delivery of the slaves, fix the character and nature of the transaction, and require that the bills of sale should be considered in a court of equity as a security for the amount that may be due from the complainant to the defendant.

It is however urged that no debt existed after the delivery of the notes and deed of trust to the complainant—but a debt may exist notwithstanding there is no bond, covenant or note to prove it. So if there had once existed a bond or note as evidence of the debt which was delivered up or cancelled, yet the debt would exist if it were not the intention of the parties to annul or extinguish it. It is true, the inference arising from the fact of giving up or cancelling the evidence of debt, would be, that the parties intended to annul or extinguish it; this inference, however, may be repelled by proof that such was not the intention of the parties.—McKinstry v. Conly, 12 Ala. 678. In the case of Flagg v. Mann, 2 Sumn. 535, Judge Story said, that the absence of a covenant to pay the debt may, in some cases, be important in ascertaining whether a transaction is a mortgage or a conditional sale, but within itself is not conclusive; the true question is whether there is a

subsisting debt between the parties capable of being enforced *in rem* or *in personam.* The evidence in this cause is sufficient to repel the inference that the parties intended to extinguish, the debt, and induces us to believe, that after the execution of the bills of sale, both the plaintiff and the defendant considered that there was a debt due from the complainant, to secure which the bills of sale were executed, and that the complainant had the right to redeem the slaves by paying it. This we think is a fair construction of the contract; and by this view of it, complete justice can be done to both parties. To hold that the contract was an absolute sale, with a right to repurchase, would enable the defendant to gain an unjust advantage over his debtor by the contract, when all must admit that it is doubtful, *to say the least of it,* whether it was intended as a mortgage or a conditional sale. The chancellor held the bills of sale to be mortgages, and such we are bound to consider them.

The decree must therefore be affirmed.