# CREWS *vs.* THREADGILL.

[BILL IN EQUITY TO HAVE ABSOLUTE CONVEYANCE DECLARED MORTGAGE.]

1. *Admissibility of party's declarations.*—An interrogatory to a witness, asking the *reason* why a party did a particular thing, does not authorize him to state the declarations of the party as to the reason or motive which induced the act ; consequently, such declarations, not being called for by the interrogatory, are not competent evidence for the party making them.

2. *To what witness may testify.*—In answer to a question calling for a conversation, a witness cannot state the *impression* made on his mind, or his *inference from what passed.*

3. *Relevancy of evidence to show terms of contract.*—Where the terms of a parol contract are in controversy, the fact that one of the parties might have effected, with another person, a more favorable contract than that for which his adversary contends, is not, *it seems*, relevant evidence for him.

4. *Allegation of tender in bill to redeem, and amendment of bill.*—In a bill which seeks to have an absolute conveyance declared a mortgage, and for a redemption and account, an allegation that the complainant "now offers to pay said defendant the amount of his said note, with interest thereon to this date, and brings the same into court, and offers to pay all costs with which he may be chargeable," is sufficient ; and, when added by way of amendment, takes effect as of the filing of the original bill.

5. *Absolute conveyance held mortgage.*—An absolute conveyance of land decreed a mortgage, against the averment of the answer that it was a conditional sale, on proof that the transaction originated in a loan of money, that the land was worth nearly double the amount advanced on it, and that the possession remained with the grantor by permission of the grantee.

APPEAL from the Chancery Court at Montgomery.

Heard before the Hon. WADE KEYES.

THE bill in this case was filed, on the 15th May, 1856, by Howell Threadgill, against Martin M. Crews ; and sought to have a deed for a tract of land, which was absolute in form, declared and established as a mortgage, and for a redemption and account under it. The deed was executed by the complainant and his wife, in the presence of two witnesses, on the 27th April, 1854 ; recited as its consideration the present payment of $225 by the defendant, and conveyed to him, with covenants of warranty, a tract of land containing about eighty acres. The bill alleged, that the complainant purchased this tract

of land from one Henry M. Elmore, on the 2d November, 1852, paid a portion of the purchase-money in cash, and, for the residue, executed his promissory note to said Elmore for $200, payable on the 1st December next after date; that in the spring of 1854, Elmore being about to remove from the State, and complainant being still unable to pay the amount due on his said note, the latter applied to the defendant, at the suggestion of Elmore, for a loan of money, "and proposed to give in pledge, to secure the payment of the same, a lien upon said land"; that the defendant, "on this assurance, agreed to lend to complainant, or to pay to said Elmore, the amount due on the purchase of said land"; that the deed for the land was executed in pursuance of this arrangement, "and was made absolute in form at the instance and suggestion of the defendant, who represented that it was the proper mode of writing such an instrument to secure him," but was intended to operate only as a mortgage; that the complainant was ignorant of the proper forms of conveyances, and relied on the correctness of the defendant's representations; that the defendant advanced to Elmore, a few days afterwards, the amount due on the complainant's note, and took Elmore's written transfer on the back of the note; that the complainant remained in the possession of the land, which was worth more than the amount advanced on it by the defendant, who, on the 20th February, 1856, instituted against complainant an action of ejectment for the recovery of the land, and entered on it, and cut down a quantity of valuable timber The prayor of the bill was, that the deed might be decreed to be a mortgage; that an account might be taken to ascertain the amount due to the defendant on the note to Elmore, and of the value of the timber which had been cut on the land; that if anything should be found due to the defendant on such accounting, the land might be sold to pay him, and the balance of the proceeds of sale be paid to the complainant; that the defendant might be enjoined from further prosecuting his suit at law, and from committing further waste on the land; and for such

other and further relief as might be demanded by the circumstances of the case.

An amended bill was afterwards filed, in these words: "Complainant, by way of amendment, by leave of the court, now offers to pay said defendant the amount of his said note to said Elmore, endorsed to defendant as before stated, with interest thereon to this date, and now brings the same into this court, and offers to pay all costs with which he may be chargeable," &c.

An answer on oath having been waived by the complainant, the defendant put in his answer without affidavit. In reference to the terms of the contract between the parties, and the circumstances connected with the execution of the conveyance, the material portion of the answer was as follows: " This defendant denies most positively that he ever obtained the said land from the complainant in the way of a pledge or lien for the repayment of the money paid by defendant to said Elmore; or that there was any agreement between him and said complainant that the payment of said money to Elmore was in the shape of a loan to the complainant; or that there was any pledge or lien connected with it, as set forth by the complainant. In regard to said contract, this defendant states that, on or about the 20th April, 1854, complainant came into the field where defendant was at work, and told him that said Elmore had come on him for the money due on the note given for said land. This defendant replied, that he would pay the money due on said note to said Elmore, provided the complainant would pay back the money to him by the 1st January, 1855, with interest at the rate of sixteen per cent. *per annum;* and also said to complainant, that if he would pay back the amount of said note, with interest at that rate, on said 1st January, 1855, he (defendant) would reconvey said land to said complainant; but, if said complainant should fail to pay both principal and interest to this defendant, as aforesaid, on said 1st January, 1855, but would pay sixteen per cent. *per annum* for the use of said money, at the commencement of each year after this defendant had paid said money to Elmore for said complainant, that then said

complainant might live on the said land, and cultivate the same,—this defendant believing sixteen per cent. to be about a fair rent for said land. This defendant further states, that this was the only agreement ever entered into between himself and said complainant as to the said land, which, by any possibility, could be construed into any lien or pledge as to the said land; and this defendant avers, that said complainant failed in any way to comply with the said agreement."

On the hearing, the complainant read in evidence the depositions of Henry M. Elmore, William Fitzpatrick, Benjamin H. Fitzpatrick, Benjamim J. Baldwin, Bird Baldwin, Charles Merriweather, Thomas Merriweather, Julius C. Alford, and Joseph Henderson; and the defendant offered the depositions of William McIntosh and John Sherwood, the subscribing witnesses to the deed, and of Duncan A. Graham.

The substance of Elmore's testimony is comprised in the following extracts: "The defendant paid me the amount of the complainant's said note, with interest, on the 15th May, 1854, in the bar-room of the 'Madison house' in the city of Montgomery. *About two weeks, perhaps a little longer, before said 15th May, I went to see the complainant, to get my money. Complainant said, that he could sell the land to Col. Alford, for an advance on his purchase from me; I do not recollect the precise amount, but think t was nearly double what he was to have paid me. I advised him to sell it; but he promptly replied, that he could do better— that the land was worth more, and he could borrow the money to pay me from Martin Crews, and would still save his land and have a home. He also said, that he would see Crews early the next morning, and advise me what he could do. So, early the next morning, he advised me that Crews would meet me in Montgomery on any day I might appoint, and pay me the note.* I then wrote to Crews to meet me in Montgomery on the 15th May following, and sent him the notice by complainant. Some days after this, I received a verbal message from Crews, through Mr. F. Brown, that he would meet me on the appointed day. Upon paying me the money, he required the transfer endorsed on the note, saying that

he wanted to protect himself from the complainant's liabilities. He asked me, if he would stand in the same relation to the land, with the endorsement on the note, that I did; and said, that he could not risk anything—that he would take a deed to the land from the complainant, and asked if I had made a deed to complainant which he would hold—that the land would be worth the money, if the complainant should not be able to pay him back his money, and the improvements would be worth the interest on the money. He said, that I had advised the complainant to sell the land to Alford; that he was determined Alford should not have it, and that he had told complainant, long before, that he would furnish him the money to pay me." "*The impression made upon my mind was, that defendant had lent the money to complainant to pay me, and would give him time to pay it back; but that it was a poor prospect to be paid back, and he would ultimately secure the land to himself, and, by lending the money to complainant, he would have the matter so arranged ia his own hands that Alford and others could not get the land from him. This, it is true, is only an inference from what passed and the manner he said it.*" I have no recollection that I ever heard defendant say that he was lending the money to complainant, or in what manner he was furnishing the money; but *the clear impression made upon my mind at the time, and how, is, that defendant was lending the money to complainant, because defendant wanted the land, and thought that was the way to get it.*" To the italicized portions of the above answers, which comprise the answers to the 3d, 4th, and 8th direct interrogatories, the defendant filed exceptions, "on the ground of irrelevancy and illegality."

The witness Alford, in answer to the 4th direct interrogatory, testified as follows: "*About the time Threadgill moved down upon the land, (date not remembered.) according to my best recollection, I told him, whenever he wanted to sell said land, at $5 per acre, to let me know it.*" The defendant excepted to the interrogatory in response to which this answer was given, as calling for illegal evidence; and also excepted to the answer, "as illegal and irrelevant." The complainant's other witnesses testified to the value

of the land in 1854, and at the time their several depositions were taken; and to the fact that the complainant was an illiterate man, and that the money due from him to the defendant had been tendered and refused.

Sherwood and McIntosh, the defendant's witnesses, each testified to the due execution and delivery of the deed, and to the fact that no money was paid at the time; and each further stated, that immediately after the delivery of the deed, Crews told Threadgill that, " if he would pay back the money, with interest, by the 1st January, he could have the land back, but that no person else should redeem the land for him." Sherwood also testified, that Crews told Threadgill, at the same interview, "that he would charge him rent from the time he (Crews) paid the money to Elmore; to which Threadgill replied, that he would do what was right about it"; but McIntosh testified, that he heard nothing said on the subject of rent. Sherwood further testified, that he carried the note given to Elmore to the complainant, at the request of the defendant, in March, 1856; and that the complainant, on receiving the note, said, " that he ought to have had the note long before." The 13th cross-interrogatory to this witness, with his answer thereto, was in the following words: " How long was it after the date of said note, or the time when Crews received it, before you carried it back to Threadgill? Why did Crews keep the note so long if it was paid? *Ans.* " Witness thinks Crews got possession of the note in the spring of 1854, but does not know the date of the note. It was near two years since Crews got possession of the note until it was returned to Threadgill. *The reason he kept it so long, as Crews said to witness, was, that he understood there were some judgments against Threadgill in Russell county, and he wanted to keep the note to show that the purchase-money had been paid.*" The complainant excepted to the italicized portion of this answer, on the grounds " that the statements of the defendant are not called for, and because the witness does not state when this information was communicated to him."

On final hearing, the chancellor pronounced the following decree: " This cause came on to be heard, on bill,

amended bill, answers, testimony, exceptions thereto, &c.; and, upon consideration thereof, it is adjudged, that the complainant has the right to redeem the land in contro- versy. It is, therefore, referred to the register, as master, to take and state an account between the parties, making all reasonable allowances to both parties; and he is in- structed to allow interest to the defendant, at the rate of 9 per cent. *per annum*, on the amount loaned by him to the complainant. It is further ordered, that the master report at the next term."

The errors assigned in this court are—" 1st, that the chancellor did not decree in favor of the defendant; 2d, that the chancellor decreed in favor of the complainant; 3d, that there is error in the decree rendered by the chan- cellor; and, 4th, that the final decree is erroneous."

WATTS, JUDGE & JACKSON, for appellant.

MARTIN, BALDWIN & SAYRE, *contra*.

STONE, J.—The exception of complainant to a part of the witness Sherwood's answer to the 13th cross-interrog- atory must be allowed. The interrogatory did not call for the declarations of Crews, and he had no authority to use his own *ex-parte* statements, not called out by his adversary, as evidence in his own favor.

[2.] We also sustain the exceptions of defendant to the following portion of the witness Henry M. Elmore's testi- mony: To all that portion of his answer to the 3d direct interrogatory, which assumes to relate what Threadgill said to him, as to the value of the land, what he could get for it, and that he (Threadgill) could obtain money from Crews, and thus save his land and have a home; also, to the portions of Elmore's answers to the 4th and 8th inter- rogatories, which are excepted to by defendant. The exception to the answer of the witness Alford to the 2d interrogatory in chief, we need not consider. If the fact which it tends to prove be material, it is amply established by other testimony, to which there was no objection or exception filed. The 5th interrogatory to the witness Alford elicited no information, and need not be considered.

[3.] The answer to the 4th interrogatory is in this lan-
guage: "About the time Threadgill moved down upon
the land, (date not remembered,) according to my best
recollection, I told him, whenever he wanted to sell said
land, at five dollars per acre, let me know it." The ques-
tion which called out this answer was objected to, and
the answer excepted to before the chancellor. The only
tendency which this testimony could have, was to show
that, if Mr. Threadgill desired to make an absolute sale
of his land, he was offered better terms by Mr. Alford
than he secured from Mr. Crews. This, we suppose, is
relied on as a circumstance tending to show that Mr.
Threadgill did not in fact make an absolute sale. In this
view, we doubt the legality of the evidence. The sub-
stance of the argument in its favor is, that because the
contract which is sought to be set up was not a prudent
one, or because another contract would have been more
profitable, this is evidence tending to show that no such
contract was in fact made. Considering the diversified
pursuits of men, and the fact that the opinions of different
persons upon the advantages of particular adventures, or
the profits derived from particular pursuits, are almost as
variant as the features of the human countenance, we
think such a rule would lead to endless confusion.—See
Mobile Marine Dock and Mutual Ins. Co. v. McMillan
& Son, 31 Ala. 711.

Under the view which we take of this case, as we shall
hereafter more fully show, we deem it unnecessary to
decide this question at this time. The controversy in this
case is not whether the contract was a *mortgage* or an *abso-
lute sale*. The defendant Crews does not deny that, by the
terms of the contract as made, Threadgill was to have the
right to redeem. He contends, however, that the contract
was a conditional sale—not a mortgage—and that because
Threadgill permitted the time to pass within which he
was authorized to repurchase, he (Crews) now owns the
property, relieved of the condition. So, whether the con-
tract was a mortgage or a conditional sale, either suppo-
sition leaves to Mr. Threadgill a reasonable motive for
preferring the arrangement with Mr. Crews, which still

left him an opportunity to preserve his homestead, rather than an absolute sale to Mr. Alford.

[4.] The amendment to the bill constituted it a good bill to redeem, provided the contract is a mortgage.—See Nelson v. Dunn, 15 Ala. 501. Such amendment, when properly allowed, takes effect as of the time of the filing of the bill.—Blackwell v. Blackwell, 33 Ala. 57.

[5.] The real issue between these parties is as follows : Threadgill contends, that he borowed money from Mr. Crews, with which to pay Mr. Elmore for the land, and executed a mortgage on the land to secure the repayment of the money ; but that this mortgage, although intended only as security, was made in the form of an absolute deed.   Crews contends, that he purchased the land absolutely, received an absolute conveyance from Threadgill and wife, but agreed to reconvey to him, provided he (Threadgill) would, by the first day of January next afterwards, pay him the money he had paid to Elmore, and 16 per cent. interest upon it.

In Locke v. Palmer, 26 Ala. 312, the Palmers, who were partners, obtained from Locke the sum of $3504 50, and executed to him an absolute conveyance of a quarter-section of land, two slaves, and other property.   About two months afterwards, Mr. Locke executed to them a defeasance, which recited that, "it was agreed between the said Wm. M. & B. D. Palmer and myself, (said Locke,) at the time of the execution of said conveyance, that if said Wm. M. & B. D. Palmer, or their assigns, should, on or before the first day of January next, repay said sum," &c., then he would reconvey to them said property, a part of which was household and kitchen furniture.   He (said Locke) thereupon bound himself, "if said Wm. M. & B. D. Palmer,"· &c., "shall, on or before the first day of January next, well and truly pay to me or my assigns said sum of money," then to reconvey said property to them.   These transactions took place in the spring of the year 1845.   The property remained in the possession of the Palmers for more than two years, they paying no rent or hire for the same; and in June, 1847, the property went into the possession of Mr.

Locke's executors, he having died in the meantime. The bill to redeem was filed in 1852.

This court, affirming the decree of the chancellor, held, that the transaction was a loan of money on mortgage security, and not a sale of the property with condition to repurchase. The language of our predecessors was, "There are, in most cases of this character, no tests which will enable a court to determine, with anything like positive certainty, whether a mortgage or a conditional sale was intended; but the inclination of equity, in such cases, is always to lean against the latter, for the reason, that an error which converted the transaction into a mortgage would not be as injurious, as a mistake which changed a mortgage into a conditional sale; and this leaning is strongly manifested, wherever the contract had its origin in a proposition for a loan, or the relation of debtor and creditor existed between the parties; these circumstances being regarded as amongst the circumstances tending to show that a mortgage was intended."

After alluding to the fact that "the buyer, instead of taking possession of the property, allowed it to remain with the seller without hire," the court proceeded to add, "All these, and especially the possession of the property remaining with the seller, are inconsistent with the idea of an absolute sale. * * * Upon a careful examination of the whole evidence, we have great doubts whether the parties contemplated an absolute sale. The inclination of our mind is rather that security only was intended; and such being the fair result of the evidence, we are bound by the principles which govern courts of equity in this class of cases, to declare the contract a mortgage instead of an absolute sale."

In Parish v. Gates, 29 Ala. 254, 261, we pointed out what we supposed a clerical error in the case of Locke v. Palmer, *supra*.

The case of Turnipseed v. Cunningham, 16 Ala. 501, if any difference can be discerned, presents a stronger case in favor of the doctrine, that courts incline to hold contracts to be mortgages rather than conditional sales, than

the case of Locke v. Palmer, *supra*. See, also, principles stated in Eiland v. Radford, 7 Ala. 724.

The above authorities must be regarded as settling a rule of property in Alabama, from which it is not now safe to depart.

In the case under consideration, if we were to leave out of view the testimony of the witness Elmore, and place our opinion alone on the admissions of the answer, and the testimony of the subscribing witnesses, it would be exceedingly difficult to distinguish this case in principle from Locke v. Palmer, *supra*. In aid of this, however, the witness Elmore testifies, that when Crews paid him the amount of Threadgill's note, he (Crews) remarked to witness, that "the land would be worth the money, if complainant (Threadgill) should not be able to pay him back the money. He (Crews) said, I (the witness) had advised complainant to sell the land to Alford—that he was determined Alford should not have it—that he had told complainant, long before, he would furnish him the money to pay me," (the witness.) These declarations of Mr. Crews are perfectly consistent and harmonious with the facts, if the transaction was a loan of money by him to Mr. Threadgill. They do not accord with what the defendant in his answer contends were the terms of the contract. We also think it is fairly inferable from the weight of the evidence, that the land, at the time Crews paid the note to Mr. Elmore, was worth more than he gave; probably twice the amount.

This case, then, furnishes most of the evidences of a mortgage. It originated in a loan of money; the possession of the premises remained with the grantor, by the permission of the grantee; and the amount of money advanced was little, if any, more than half the then market value of the lands. Considering the ignorance of Mr. Threadgill, we think but little importance should be attached to the fact of his receipt of the note when it was sent to him, or to the remarks he then made. Upon a full consideration of all the facts and circumstances, and guided by the principles settled in the cases of Turnipseed v. Cunningham, and Locke v. Palmer, *supra*, we

fully concur with the chancellor, in holding the deed of Mr. Threadgill to be a mortgage security for the payment of money. We find no error in the directions for taking the account.—Parish v. Gates, 29 Ala. 254.

The decree of the chancellor is affirmed.