BANKER *v.* CHEVROLET MOTOR CO.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—FINDING OF DEPARTMENT CONCLUSIVE IF SUSTAINED BY ANY EVIDENCE.

On certiorari to review an order of the department of labor and industry denying compensation for the loss of an eye, based on the finding of fact that plaintiff had no useful vision in the eye, if there is any evidence in the record to sustain said finding, the order must be affirmed.

2. SAME—DEPARTMENT TRIER OF FACTS AND JUDGE OF CREDIBILITY OF WITNESSES.

In proceedings before the department of labor and industry under the workmen's compensation act, the department is the trier of the facts and judge of the credibility of the witnesses.

3. SAME—LOSS OF EYE—FINDING SUSTAINED BY RECORD.

The finding of the department of labor and industry that plaintiff did not have any useful vision in the eye for which he was claiming compensation, and therefore was not entitled to any award, *held,* sustained by the record. McDONALD and POTTER, JJ., dissenting.

Certiorari to Department of Labor and Industry. Submitted April 4, 1928. (Docket No. 23, Calendar No. 33,237.) Decided October 1, 1928.

Ben Banker presented his claim for compensation against the Chevrolet Motor Company for an accidental injury in defendant's employ. From an order denying compensation, plaintiff brings certiorari. Affirmed.

Recovery of compensation under workmen's compensation acts for injury to eyes as affected by pre-existing disease, see annotation in 19 A. L. R. 106.

* Continued from Vol. 243.

*William A. Alfs* (*John P. MacKay,* of counsel),
for appellant.

*J. G. Stevenson,* for appellee.

Potter, J. *(dissenting).* Plaintiff brings certiorari to review an order of the department of labor and industry denying compensation as claimed. He was injured in April, 1926. September 23, 1926, he gave notice to the Chevrolet Motor Company of total loss of his left eye, claimed to have been caused by complication and infection from grindings of emery lodged therein. The case was heard before a deputy commissioner of the department of labor and industry and an award made February 5, 1927, in accordance with plaintiff's claim. Defendant asked for and obtained an order of review by the department, claiming the award of the deputy commissioner was contrary to the law and facts and against the great weight of evidence, and other causes. The department found the order of the deputy commissioner should be modified and entered an order reciting, "according to the evidence in this case we find as a fact the plaintiff had no vision." Plaintiff alleges it erred in so holding, claiming there was no competent legal evidence or a scintilla of evidence to support its finding.

Plaintiff was employed as a job setter, grinding motor car brake bands at 85 cents an hour. The department found plaintiff did suffer an accidental injury by getting a piece of emery or some other foreign substance in his left eye during the latter part of April, 1926; that defendant had knowledge of such injury, and that a claim was filed therefor within the statutory period. The sole question is whether plaintiff had, prior to the accident, any useful vision of his left eye—whether prior to the acci-

dent he had any eye to lose. Plaintiff testified he could read at six feet with his left eye. When injured he went to the company's doctor. The eye was bandaged. Not getting better, he was sent to an eye specialist and later the eye was removed. This is corroborated by several other witnesses. There is no competent evidence to dispute it.

The defendant called Dr. Childs, but Dr. Childs did not make the record he testified about; had no recollection of ever having treated plaintiff; only thought he examined him when hurt because witness treated most of the persons injured at the Chevrolet factory. His testimony is based upon a written memorandum. The memorandum was not his. His testimony is an attempted interpretation and explanation of someone else's record.

The card from which he testified was dated March 12, 1919, signed by plaintiff. So far as it relates to this case it says:

*"Have you ever had any trouble with your eyes, ears, nose or throat? No.* What serious accidents or diseases have you had? See left eye."

In the lower left-hand corner of this so-called physical examination blank is the following, in different colored typewriting: "Nearly Blind. Vision R L 15-50."

The testimony is practically undisputed that plaintiff had an injury on April 28, 1926, to his left eye. The general accident report under date of April 28, 1926, shows an injury to the right eye. The cause of the accident is stated as "Something flew into my eye while grinding brake bands."

The department found plaintiff suffered an injury on April 28, 1926, to his left eye. On the back of a general accident report is the following:

"June 4, 1926.

"On April 28, 1926, while grinding brake bands, something flew in my eye. I reported to the hospital at once. I came in for treatment the next three nights. I didn't report to hospital any more after that, as my eye didn't bother me. When I awoke on June 3, 1926, at 4: 00 p. m., my eye was swollen and sore. I didn't go to work and I reported to plant #1 hospital on June 4, 1926.

(Signed) "BEN BANKER."

Below this is the following: "Foreign body in left eye."

This report signed by Banker, together with the notation, "Foreign body in left eye," was scratched out by pencil.

On another general accident report is the following:

"June 5, 1926.

"When I awoke on June 3, 1926, at 4: 00 p. m., my eye was swollen and sore. I had no pain, nor was it swollen when I went to bed at 7: 00 a. m. on June 3, 1926. I don't remember of getting anything in my eye, nor injuring it in any way. This condition came about all of a sudden. I reported to the hospital June 4, 1926.

"BEN BANKER."

Why two reports, each typewritten, were made by the company's employees and signed by Banker under date of June 4, 1926, and June 5, 1926, is not satisfactorily explained.

Dr. Childs admitted he knew nothing about the case. The deputy commissioner took a hand in his examination. The following occurred:

"*Q.* I want to ask him a question: As I understand, the condition of the left eye does not show any percentage—

*"A.* No, sir; does not.

*"Q.* Of sight?

*"A.* That is correct.

*"Q. What you mean is, on this card there is no record of any condition of the left eye?*

*"A. Except the man's admission that something was wrong.*

*"Q. No admission—*

*"A. Said—see left eye.*

*"Q. Is that an admission?*

*"A. That is a history, Mr. Beattie.*

*"Q. Well, a history. See the left eye. That is true. But that of itself, without drawing deductions, wouldn't mean much, would it?*

*"A. It means the man was asked the question and he pointed—made some notation."*

To constitute evidence it must appear the witness has some knowledge of what he testifies to. The testimony of any witness expert or nonexpert, as to something he knows nothing about, is not evidence. Dr. Childs did the best he could for his employer. He attempted to interpret and construe the writing on a card he did not make and which he knew nothing about. The card speaks for itself. The doctor did not remember the man, the accident, nor the eye. All this testimony should have been stricken from the record. That it was permitted to stand, in view of the fact it was given by one not competent and qualified to testify, does not raise it to the dignity of evidence.

Dr. Hudson testified, but Dr. Hudson's record was in relation to an examination in June and did not relate to the eye injured on April 28th, removed June 5th. The records of the Chevrolet Motor Company in relation to this injury were changed as above indicated. Dr. Hudson testified:

*"The Commissioner:* This statement on June the 4th, describes, telling about getting something in his eye. And scratched out—the other one doesn't—a complete history of it. I don't understand how they could get it mixed so. There is the difference in his—there is the distinct history of getting something in the eye.

*"Dr. Hudson:* On the 28th, this is the history I took on this case here. That there. That is—

*"The Commissioner:* On the 4th, they must have gotten another history.

*"Dr. Hudson:* Yes."

Only that part of the statement of June 5th in typewriting was signed by plaintiff. The statement in writing made by the doctor was not signed. He sent plaintiff to Dr. Begle, another witness for defendant, who testified in relation to plaintiff's injury:

*"Q.* Didn't he tell you having received some injury some years previous to this?

*"A.* Yes, he gave me a history having when a boy, an injury. *I have it marked sand.* And he stated that *he couldn't see much if straight ahead, but that he could see looking down,* and his vision in his right eye I found to be 20.70.

*"Q.* What is that? How much vision is that, doctor, in the percentage? How much vision would that be? A fair vision, poor vision or bad vision?

*"A.* 20.70 is in the middle scale, I should say. 20.70 represents about from 65 to 75 per cent. vision."

And upon examination by the deputy commissioner he testified:

*"A.* Well he says here, since boy eight years old, certain injury to the left eye, *couldn't see much straight ahead. But could see down.* Now, by that

I understand if a man says he can't see much straight ahead—I merely can interpret what he says.

*"The Commissioner:* I don't know as that is material."

Dr. Begle also testified that when plaintiff came to him he told him he could see down, but could not see straight ahead. In response to the questions of the commissioner he said:

"*Q.* If he said he had some vision, you believe he had it, don't you?

"*A.* If he said he had it.

"*Q.* He didn't say anything that would allow you to dispute that; that he had some vision?

"*A.* No, I wouldn't be able to say. I wouldn't be able to say.

"*Q.* Any vision at all?

"*A.* I wouldn't say that.

"*Q.* That is, when he said just see down—no reason but believe but that is true?

"*A.* Yes.

"*Q.* That is all. As a result of the examination, you are of the opinion he had no useful vision in that left eye?

"*A.* My impression it wasn't worth very much. Certainly had no useful vision in that eye."

Dr. Begle, after testifying plaintiff could see down, with this eye, but not much straight ahead, gave it as his impression plaintiff had no useful vision in the left eye. He pointedly refused to testify plaintiff had no vision at all in the left eye. He testified he did have such vision. One's impression of the usefulness of another's vision, where, as here, it is conceded such vision existed, is not evidence. *People* v. *Stanley,* 101 Mich. 93, permitted one to testify to his impression of another's identity whom witness saw. The term was used as indicative of a weak

degree of positiveness, but its effect was for the jury. A witness's impression based upon what some one else said is not competent (*Id.*), being hearsay. Impressions are based on assumed facts and are not evidence. *Haney* v. *Village of Pinckney,* 155 Mich. 656; *Crews* v. *Threadgill,* 35 Ala. 334; *Morris* v. *Stokes,* 21 Ga. 552; *Clark* v. *Bigelow,* 16 Me. 246.

The most that can be said of the only professional witness who knew anything about what he was testifying to, according to his own statement, is that he had an impression plaintiff had no useful vision of his left eye, though he admitted he did have some vision. An impression is a mere notion unaccompanied by an honest conviction (*Morrisette* v. *State,* 77 Ala. 71; *Currier* v. *State,* 157 Ind. 114 [60 N. E. 1023]); an indistinct imaginary image in the mind of some supposed fact, whether correct or incorrect; something that is fully as likely to have been the result of suggestion and a desire to be of assistance to an employer as of unbiased judgment. Impressions are not evidence. They may or may not be based upon facts. They do not arise even to the status of a respectable guess. We cannot substitute impressions for evidence, nor ignorance for truth.

Mr. Karl was a hospital attendant. He testified:

"*Q.* And then you examined his left eye?

"*A.* We did.

"*Q.* And as a result of that examination you found that he had 15-50 vision in the left eye?

"*A.* In the right eye.

"*Q.* In the right eye? 5"—

"*A.* 5"—

"*Q.* 5" means more than—means more than 20 per cent. line of vision, does it? Or means less than 20 per cent. line of vision?

"*A.* I can't tell you. I don't remember the exact percentage, exactly.

"*Q.* Here is Chapman's Percentage of Vision Table. Will you look at it, and tell us what 15-50 means, as to the percentage of vision?

"*A.* Approximately 15 per cent., possibly a trifle more.

"*Q. In other words, 75 per cent., in his left eye?*

"*A. That is correct.*   \*   \*   \*

"*Q. And you are testifying, not from memory, but from what the card disclosed to you?*

"*A. Just what the card shows.*

"*Q.* Or rather, what the card don't disclose?

"*A.* From the card, and what it does and don't disclose."

Dr. W. J. Berry who removed the eye was the only physician not employed by the Chevrolet Motor Company who testified in relation to the case. He says at the time the plaintiff came to him his left eye was in a bad condition; that plaintiff gave him a history of the accident and of getting emery dust in the eye on April 28th, and that it had been paining him ever since; that emery dust could produce the infection. That there was nothing about the condition of the eye that would in any way lead him to doubt the history of the injury as given to him by plaintiff.

There is no credible evidence by any witness who knew anything about the facts, that plaintiff could not see to some extent with his left eye prior to the injury, and if plaintiff could see at all with the eye, it is self-evident such vision was useful. The fact he did not have normal vision is no reason for denying compensation. If normal vision was required, all those whose vision was below normal would be denied compensation.

The conclusion of the deputy commissioner was correct. *Purchase* v. *Refrigerator Co.,* 194 Mich. 103; *Hayes* v. *Motor Wheel Corp.,* 233 Mich. 538; *Crane* v. *Ætna Portland Cement Co.,* 234 Mich. 110.

The order of the department of labor and industry should be reversed and the order of the deputy commissioner reinstated, with costs to plaintiff.

McDONALD, J., concurred with POTTER, J.

FELLOWS, J. I am unable to agree that the decision of the department of labor and industry shall be reversed in this case. The department recognized the rules of law laid down by this court in eye cases, and appreciated that the instant case was a close and difficult one on the facts. The department found on the facts that the plaintiff did not have a useful vision to lose, and, treating the case as purely one of fact and adopting a reasonable construction of the language used by the witnesses, most of whom were medical experts, disallowed plaintiff's claim. If there is *any* testimony in the record to sustain this finding of fact the order of the department must be affirmed. I think there was an abundance of testimony to sustain the finding. The department in its opinion sets out at considerable length the testimony which was persuasive to it. I shall quote but a fragment of it. Plaintiff had worked at the Flint plant of defendant in 1919. He was there examined by Dr. L. H. Childs, now chief surgeon of defendant. The doctor testified to making the examination of plaintiff March 12, 1919, and was shown and interpreted the record then made. He said:

"On the front part of this examination blank is a history given by the man, signed by the man, he was asked as one of the questions on the front side of this sheet—what serious accidents or diseases have you had? In saying it, very evidently he pointed to his left eye—there is a notation: 'See left eye.' Upon examining his eyes, there is a notation that the man, with both eyes, could see about 15-50. No notation, under the left eye, which would indicate

at 15 feet, he was unable to read 15-200, which is practically blindness.''

Another doctor who examined him shortly after the date now claimed to have been the date of the accident testified:

"*Q.* What did you find?
"*A.* An old injured eye, acutely inflamed at the time, and I asked him if he had any accident to it, and he didn't remember any accident to the eye. He had no traumatic injury, no penetration injury to the eyeball, and he told me it had been, had it injured some years before, 8 years. I have got the record.
"*Q.* And you wrote the history of the case, as he told you right on that?
"*A.* On this, yes.
"*Q.* Did he sign that?
"*A.* Yes, he signed that.
"*Q.* He signed that in your presence?
"*A.* Yes.''

Another doctor who examined him about this time said:

"The indication was that he had tracoma, an old tracoma of both eyes. The left eye showed the results of the tracoma on the side of the eye, in that the cornea was covered with scars, and more than that, there had been evidently frequent inflammation of the cornea, so that the tissue around the cornea had grown down into the cornea, and made the cornea much smaller than the normal cornea usually is.   *   *   *
"*Q.* One more question, doctor. As a result of your examination, and what you found as to the condition of the left eye, can you tell us or not, whether this man had any trouble even in his left eye?

"*A.* I can't tell you absolutely; I would say, my impression is that he had no useful vision. He would have no useful vision in that eye.     *     *     *

"*Q.* As a result of the examination, you are of the opinion he had no useful vision in that left eye?

"*A.* My impression it wasn't worth very much. Certainly had no useful vision in that eye."

I shall not quote further from the testimony. What I have quoted is sufficient to sustain the finding. The department was the trier of the facts and the members of the commission the judges of the credibility of the witnesses. Speaking of the plaintiff's testimony, the opinion states:

"Some of the plaintiff's testimony is contradictory and we are not entirely sure that it is altogether due to his lack of understanding of the English language, and we are not greatly impressed with the sincerity of the plaintiff because of certain of his answers, denying certain statements that witnesses testify he previously had made with reference to his eyesight."

I am not persuaded that we should reverse this case.

Fead, C. J., and North, Wiest, Clark, and Sharpe, JJ., concurred with Fellows, J.